UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

– – – – – – – – – – – – – – – – x
                                :
UNITED STATES OF AMERICA        :  No. 3:18CR90(JAM)
                                :
          v.                    :
                                :
ANGEL CABRERA,                  :
                                :  New Haven, Connecticut
               Defendant        :  March 18, 2019
                                :
– – – – – – – – – – – – – – – – x

<u>SENTENCING</u>

BEFORE:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

    FOR THE GOVERNMENT:

         OFFICE OF THE UNITED STATES ATTORNEY
              450 Main Street
              Hartford, Connecticut 06103
         BY:  BRIAN P. LEAMING, AUSA

    FOR THE DEFENDANT:

         SHEEHAN & REEVE
              350 Orange Street
              Suite 301
              New Haven, Connecticut 06510
         BY:  KARA MOREAU, ESQ.
              MICHAEL O. SHEEHAN, ESQ.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

| | |
|---|---|
| 1 | **10:05 A.M.** |
| 2 | THE COURT:  We're here today for sentencing in |
| 3 | the matter of United States of America v. Angel Cabrera. |
| 4 | May I have appearance of counsel for government, |
| 5 | please. |
| 6 | MR. LEAMING:  Brian Leaming on behalf of the |
| 7 | United States. |
| 8 | MS. MOREAU:  Good morning, Your Honor.  Kara |
| 9 | Moreau on behalf of Angel Cabrera, and Attorney Michael |
| 10 | Sheehan. |
| 11 | MR. SHEEHAN:  I would indicate I was appointed |
| 12 | to represent Mr. Cabrera at his initial presentment. |
| 13 | Attorney Moreau has assisted me throughout this case.  I |
| 14 | have spoken with Mr. Cabrera, he has no objection to |
| 15 | Attorney Moreau. |
| 16 | THE COURT:  It's fine for either of you to speak |
| 17 | as you'd like to at the sentencing. |
| 18 | MR. SHEEHAN:  Thank you, Your Honor. |
| 19 | THE COURT:  Mr. Cabrera, are you doing okay |
| 20 | today? |
| 21 | THE DEFENDANT:  Yes, Your Honor. |
| 22 | THE COURT:  Sir, do you have family members |
| 23 | here? |
| 24 | THE DEFENDANT:  Yes.  I have my mom, my |
| 25 | girlfriend, and my daughter. |

1          THE COURT:  Is that Ms. Cosme?

2          MS. COSME:  Yes.

3          THE COURT:  And your girlfriend?

4          MS. MOREAU:  Yes, Samiras Pica.  And their

5    daughter.

6          THE COURT:  Welcome to them.

7          Back on October 9, 2019, Mr. Cabrera appeared

8    before the Court for purposes of entering a plea of guilty

9    to a charge of conspiracy to use and carry a firearm in

10   relation to a drug-trafficking offense.  A Presentence

11   Report has been prepared by our probation officer Megan

12   Chester who is here today in the courtroom.  We thank you

13   for your work on the Presentence Report.

14         Mr. Cabrera, I want to review with you what I'm

15   going to discuss during today's sentencing proceeding to

16   make sure you understand what we're going to cover.

17         The first thing I'm going to do is I'm going to

18   have some pretty technical matters to cover, mostly with

19   the lawyers, a little bit with you.

20         When I'm done with that, I'll hear from any

21   victims if there is a victim.  It looks like, Mr. Leaming,

22   the victim in this case, the one that Mr. Cabrera I guess

23   was punching, is not present in the courtroom and has not

24   submitted a statement.

25         MR. LEAMING:  That's correct, Your Honor.

```
 1            THE COURT:  But you've been in touch with him?

 2            MR. LEAMING:  We've actually lost contact with

 3   him, Your Honor.  We had conversations with Victim B, he's

 4   friends with Victim A, who also has been unable to reach

 5   Victim A.  We did notify him by mail, various letters; the

 6   last few have come back undelivered.  Apparently, he has a

 7   couple of pending motor vehicle offenses, he's failed to

 8   appear, and a warrant has issued for his arrest.

 9            THE COURT:  After that I'll turn to Ms. Moreau

10   for you to make any statement or argument on Mr. Cabrera's

11   behalf.  Mr. Sheehan is also welcome to add anything he'd

12   like.

13            And Mr. Cabrera, you'll have an opportunity as

14   well to make any kind of statement you'd like.  I've

15   obviously received and reviewed your letter that you

16   wrote.  And if your family members wish to say anything as

17   well, I've reviewed the letters that have been submitted

18   on their behalf as well, they'd be welcome to do that.

19            Then I'll hear from Mr. Leaming.

20            And then, Ms. Moreau, if you have anything to

21   say in response to Mr. Leaming, that's fine, before I turn

22   to the imposition of sentence.

23            Do you understand that, sir?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  In terms of what I've reviewed, I've
```

1    reviewed everything that's been filed on the docket in the

2    case.  That, of course, principally includes the parties'

3    plea agreement, the Presentence Report, and the two

4    addenda that have been filed to the Presentence Report, as

5    well as the financial statement, and the parties'

6    respective sentencing memoranda along with the

7    attachments.

8              Is there anything else that the parties think I

9    should have reviewed?

10             MR. LEAMING:  I don't believe so, Your Honor.

11             MS. MOREAU:  Besides the letters that were

12   provided by his mom, stepfather, and boss, that would be

13   it, Your Honor.

14             THE COURT:  Yes, that was an attachment to your

15   sentencing memo.  I've certainly reviewed those as well.

16             MS. MOREAU:  Yes.

17             And I believe that Officer Chester has brought

18   to your attention the two progress reports towards his

19   GED.

20             THE COURT:  Yes.  I have a reviewed all of

21   those.

22             Mr. Cabrera, have you read both the Presentence

23   Report and the two addenda to the Presentence Report?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  Have you discussed them with

1    counsel?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  I'll ask all counsel, is there any

4    factual objection to what's set forth in the Presentence

5    Report and the addenda?

6           MR. LEAMING:  Not from the government,

7    Your Honor.

8           MS. MOREAU:  No, Your Honor.

9           THE COURT:  I'll adopt the Presentence Report's

10   factual statements.

11           In terms of the Sentencing Guidelines

12   calculation which I'm required to consider in the case, it

13   looks like there's a final offense level of 21 and a

14   criminal history category of III.  That would correspond

15   to a recommended Sentencing Guidelines range of between 46

16   to 57 months of imprisonment.  That could be followed by a

17   term of between one to three years of supervised release.

18   A sentence could include, under the Sentencing Guidelines,

19   a fine of between $5,000 to $150,000.  I'm required to

20   impose a special assessment of $100.

21           And I understand, it sounds like from

22   Mr. Leaming's description, that there's no request for

23   restitution on behalf of the victims.

24           MR. LEAMING:  That's correct, Your Honor.

25           THE COURT:  So does that sound correct in terms

1    of what the Sentencing Guidelines range should be, apart

2    from the parties' arguments?

3              MR. LEAMING:  Yes, Your Honor.

4              MS. MOREAU:  Yes, Your Honor.

5              THE COURT:  Okay, all right.

6              So I think with respect to the supervised

7    release, Mr. Cabrera, it's my intention certainly to

8    impose a term of supervised release.  I'll hear from your

9    counsel about that.  In the ordinary course when the Court

10   imposes a sentence of supervised release that follows any

11   term of imprisonment, there's numerous conditions.

12   There's the standard conditions under the Sentencing

13   Guidelines.  There are so-called mandatory conditions such

14   as not to commit another federal, state, or local offense.

15   But there are also something called special conditions.

16             And in the Presentence Report -- do you have

17   that in front of you, sir, the Presentence Report?  If you

18   flip over to Paragraph 99 of the Presentence Report,

19   you'll see that there's some pretty specific so-called

20   proposed special conditions.  And I'd like to ask

21   Mr. Cabrera and his counsel if you anticipate any kind of

22   an objection to those very specific conditions set forth

23   in Paragraph 99 of the Presentence Report that essentially

24   provide that there's no communication or otherwise contact

25   with any known member of the Almighty Latin King Nation

1    gang without, of course, first getting the permission of

2    the Probation Office; a requirement that you participate

3    in educational and vocational program, glad to see you're

4    already going down that road; of course not to possess a

5    firearm, never even touch a firearm or any kind of

6    ammunition ever again; and also to have your person,

7    residence, office, or vehicle subject to a search based

8    upon reasonable suspicion of contraband if that were the

9    unfortunate eventuality in the case; and then of course to

10   participate in a substance abuse treatment program as

11   approved or recommended by the Probation Office and

12   approved by the Court, whether it be inpatient or

13   outpatient.  Do you remember those conditions, reading

14   about those?

15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  Are there any kind of objections to

17   those conditions?

18            THE DEFENDANT:  No, Your Honor.

19            THE COURT:  So I think that's it in terms of the

20   technical matters that I had to cover with the parties.

21            Ms. Moreau, if you'd like to proceed.

22            MS. MOREAU:  Yes, Your Honor.

23            As you know, Mr. Cabrera's mom, Catherine, is

24   here.  His girlfriend Samiras is also here with their

25   daughter.

1        Mr. Cabrera's stepfather, Edmundo, really wanted

2    to be here but he had to work, but Your Honor has received

3    a letter of support in the sentencing materials.

4        THE COURT:  Certainly read it, yes.

5        MS. MOREAU:  And Mr. Cabrera's boss, Alex

6    McDonald, also wanted to be here, but as Your Honor knows,

7    he's the owner of Luna Pizza and has a difficult time

8    taking time away.

9        THE COURT:  Understood.

10        MS. MOREAU:  But he appreciates Your Honor's

11    attention to the letter that he was also able to provide.

12        THE COURT:  Now, did Mr. Cabrera leave the

13    employment at Luna?  When did he leave?

14        MS. MOREAU:  He left in July of last year.  He

15    left anticipating his arrest in this case and in the

16    pending state case.  The reason that he left was because

17    he was working long hours there, 40 hours a week, and he

18    was afraid that he was going to be arrested at the

19    business and that that was going to cause negative

20    attention to the business.  He expressed to me he has a

21    lot of respect for Alex and felt like he was letting him

22    down, and wanted to do his best not to bring any negative

23    attention that might be brought by his arrest away from

24    the business.

25        THE COURT:  So he knew that he was about to be

1    arrested.  When did he end up getting arrested?

2             MS. MOREAU:  He was arrested on state charges on

3    January 31st.  He entered state custody February 1st of

4    last year, 2018.

5             THE COURT:  So basically a six-month gap then?

6             MS. MOREAU:  Yes.  He was anticipating his

7    arrest on the state charges.

8             THE COURT:  Did he tell Alex that?  Did he say,

9    listen, I'm about to get arrested and I don't want to

10   create a commotion or a kerfuffle with the business?

11            MS. MOREAU:  He didn't tell Alex that

12   immediately.  But he immediately regretted it.  He wrote

13   Alex a letter of apology that he sent to Alex while he was

14   in prison apologizing for the way that he had left.  He

15   felt the way that he left let him down, and that's why he

16   wanted to give that apology and ask for his forgiveness.

17            THE COURT:  If he didn't tell Alex the

18   truth about why he left, what did he say?

19            MS. MOREAU:  He stopped showing up for work is

20   what had happened.  He has since told Alex the truth about

21   what happened, apologized, and has asked for his

22   forgiveness.

23            THE COURT:  Basically just cold turkey, just

24   didn't show up at all?

25            MS. MOREAU:  I believe he stopped showing up for

1    certain shifts.  He started working at Luna Pizza in 2012.

2    Alex has known the struggles that Mr. Cabrera has had and

3    was attempting to guide him through these struggles.  Alex

4    certainly knew about what was happening with Mr. Cabrera's

5    life and was upset initially when Mr. Cabrera didn't come

6    to work.  He was a valued member of the team, as

7    Your Honor has read from the letter.  And has since

8    forgiven Mr. Cabrera and is more than willing to give him

9    another chance.  When I spoke with Alex, what he said to

10   me was, "I believe in second chances, and I believe most

11   importantly in Mr. Cabrera."  He knows that Mr. Cabrera

12   has struggled through this case and through the other

13   cases, but he does believe that he's seen the change and

14   that Mr. Cabrera is ready to take that next step.  And

15   that's why he's expressed to me his willingness to give

16   Mr. Cabrera that chance when he comes back, to give him an

17   opportunity to continue working for him and continue

18   moving his way up.  He's confident that Mr. Cabrera has

19   realized the path that he was going down is not a path

20   that he wants to be on.

21              THE COURT:  Does Alex know about the other

22   charge --

23              MS. MOREAU:  He does.

24              THE COURT:  -- of beating up the homeless woman?

25              MS. MOREAU:  Alex is fully aware of the state

 1    charges and the facts of this case.  Mr. Cabrera is

 2    certainly not proud of the facts of either of these cases.

 3    But at the same time, he knows the Mr. Cabrera that I've

 4    gotten to know.  He knows the individual who is hard

 5    working, who is dedicated to his family, and will be a

 6    valuable member of the team.  And so he's able to see the

 7    whole person.  And for that, he doesn't have the

 8    hesitation of giving him another chance and bringing him

 9    back as an employee.

10             THE COURT:  Okay.

11             MS. MOREAU:  That brings me to the facts of this

12    case.

13             The facts of this case are troubling, there's no

14    denying that.  Mr. Cabrera, like I've said, is not proud

15    of the choices that he's made in this case.  The

16    government's sentencing memo outlines the facts of this

17    case.  We're not here to dispute those facts or to try to

18    downplay them.

19             Almost two years ago in April of 2017,

20    Mr. Cabrera went with a group of guys to chase a drug

21    dealer off of a street corner.  The two groups got into a

22    fight.  Mr. Cabrera punched a man in the head.  Shots were

23    fired back and forth.  Two of Mr. Cabrera's co-defendants

24    were shot.  Everyone ran.  Mr. Cabrera helped discard a

25    gun.  This is unacceptable behavior.  And we and I am

1    certainly not here to suggest differently.

2              The indictment in this case was filed in May of

3    2018.  Just five months later in October of 2018,

4    Mr. Cabrera entered a guilty plea in this case.  He

5    entered this guilty plea quickly because he wanted to

6    quickly accept responsibility.  He had already taken time

7    to reflect on his life, and he wanted to take

8    responsibility for his actions.

9              When the indictment was filed in this case, as

10   Your Honor knows, Mr. Cabrera had already been in state

11   custody.  He was arrested on January 31st of 2018,

12   officially entered federal custody February 1st of 2018.

13             We are currently to get Mr. Cabrera into federal

14   custody.  It's not clear what effect the 13 months he has

15   currently spent in prison will have on his sentence.  We

16   recognize that's not within the Court's control.  But we

17   do ask the Court factor in the fact that Mr. Cabrera has

18   been in custody for 13 months when determining what an

19   appropriate sentence in this case would be.

20             THE COURT:  So in other words, as far as you

21   know, the BOP would not credit the time that he spent so

22   far in custody, given that he's in custody on a separate

23   state charge?

24             MS. MOREAU:  It's not entirely clear.  His state

25   cases are pending.  He goes back into his state court case

```
 1    a week from this Wednesday.  Depending on the disposition
 2    he receives, it's not entirely clear where those 13 months
 3    will get credited.  And we understand that that's not
 4    within Your Honor's control.  However, we would ask that
 5    you would take it into consideration.
 6              THE COURT:  I guess I thought that ordinarily
 7    the BOP does not credit time that's spent in state custody
 8    where that time for custody has spent for a different
 9    charge.
10              MS. MOREAU:  Yes.  If he receives a disposition
11    that involves jail sentence, that involves time.
12              THE COURT:  I see.
13              MS. MOREAU:  Of course if the charges ended
14    up -- if he received a dismissal or if he received a
15    sentence that didn't involve jail time --
16              THE COURT:  -- then the BOP --
17              MS. MOREAU:  -- the BOP would credit.  But
18    because it's not entirely clear, it's going to depend on
19    what happens with the state court charges, that's
20    something we wanted to bring to Your Honor's attention and
21    ask you to take it into consideration.
22              THE COURT:  Understood.
23              MS. MOREAU:  So I first met Angel in June of
24    2018, last summer.  At that time he had been incarcerated
25    about four months.  He had never previously spent any
```

1    significant period of time in prison.  At that time he was

2    polite, very quiet, very respectful.  He's always been

3    extraordinary respectful with me.  But he was also angry.

4    He was angry with himself.  He was angry with his choices.

5    His mom was sick.  She had been on kidney dialysis for 11

6    years.  She had underwent a kidney transplant.  His

7    girlfriend was pregnant and she was due in a few months.

8    And he was very angry that he wasn't going to be there to

9    take his mom to her doctor's appointments and to help in

10   her recovery like he had always done for the past 11

11   years.  He was very angry that he was going to miss the

12   birth of his daughter.  And he was very angry and ashamed

13   that he had been involved in all of this.  He was ashamed

14   of the harm he had caused and ashamed that he had been

15   part of this group.

16          But he was still determined.  And he indicated

17   to me from the start he was determined to put himself on a

18   different path.  He was determined to not come back here.

19          THE COURT:  So why was he part of this group?

20   What is it?  He's got a steady job, he's caring for his

21   mom, and then he says, hey, one day I'm just going to go

22   out and start running off drug dealers who pose some sort

23   of threat to the Latin Kings?

24          MS. MOREAU:  It's not an excuse and this is not

25   meant as an excuse, this is the group of people that

1     Mr. Cabrera grew up with in Hartford.  These were his

2     friends.  These are not people he is proud to have

3     associated with and these are not the people that he wants

4     in his life moving forward.  He knows that moving forward

5     he needs to continue to work hard so he can be there for

6     his daughter, for his girlfriend, for his mom.

7               His daughter was born in September of 2018.  He

8     wasn't there.  He wasn't at the hospital.  He still, to

9     this day, has never held his daughter.

10              His mom and Samiras have done a really good job

11    fostering a relationship between his daughter.  His mom,

12    Catherine, picks up his daughter on the weekends, they get

13    to spend weekends together.  And Samiras has been doing

14    her best.  This hasn't been easy on her, but she's excited

15    for when Angel will be able to get out and be there for

16    her.  And she's confident that he will be.

17              Your Honor, we don't ask for a sentence on the

18    low end of the guidelines to reflect the facts and

19    circumstances of this case.  Those are undeniably

20    concerning, and we understand Your Honor's pause when

21    considering the facts.  But we do ask for a sentence on

22    the low end of the guidelines to reflect the sentencing

23    objectives.

24              As the Court is more than well aware, the

25    sentencing objectives direct a sentence that is sufficient

```
 1    but not greater than necessary to satisfy the goals of

 2    sentencing.  The need for individualized justice is the

 3    need to consider the whole person.

 4            Mr. Cabrera, like I stated, is hard working and

 5    committed to his family, and he does have great family

 6    support.  His mom, Catherine, like I said, is a very

 7    strong woman who has gone through a lot in her life.

 8    After being on dialysis for eleven years, she received a

 9    kidney transplant, and then within a couple months went

10    right back to work as a school bus driver.  This case has

11    not been easy on her.

12            THE COURT:  Still working, is she?

13            MS. MOREAU:  Yes.

14            THE COURT:  Driving buses?

15            MS. MOREAU:  Yes.

16            She's recovered very well and immediately wanted

17    to go back to work.  She was the one asking the doctor

18    when she would be ready to return to work.  She's always

19    been a very hard-working person her whole life and has

20    done her best to provide for Angel, and in many ways Angel

21    feels like he let her down with this case.  That's been a

22    motivator for him to not let her down again.

23            Before this case, Angel had never spent any

24    significant period of time in jail.  He's got two prior

25    state cases, but both of those cases resulted in suspended
```

1   sentencing.  As Officer Chester notes in her Presentence

2   Report, the Court may wish to consider the fact that Angel

3   has limited custodial history when determining what an

4   appropriate sentence would be, in determining whether the

5   guidelines range is greater than necessary to accomplish

6   the purposes of criminal sentences.

7           Angel has been incarcerated now a little over 13

8   months.  In those 13 months he has never received a

9   disciplinary ticket.

10          He is determined to be a better man so he can be

11  there for his family.  He wants to work full-time.  He

12  wants to go back to school.  He's expressed to me an

13  interest in returning to a technical school once he

14  receives his GED at Porter and Chester which would provide

15  him with an opportunity to receive a mechanic's license so

16  he would be able to work full-time at the pizza shop but

17  also follow something that he is passionate about.  He

18  worked on cars with his uncle growing up.  And he knows

19  that's something he could do moving forward to provide for

20  his family.

21          Another thing that Angel has noted to me is it

22  was very difficult for him to grow up without a father in

23  his life.  And he intends to do everything he can to make

24  sure that the same doesn't happen for his daughter.  He

25  feels deep regret and shame that he wasn't there at the

1    hospital when his daughter was born.  And he wants to make

2    sure he is in his daughter's life.

3            Like we spoke about, Your Honor, Angel had been

4    working at Luna Pizza since May of 2012.  He started as a

5    dishwasher.  He then went to prep, prepping the pizzas.

6    Then he went to a full-on pizza chef.  He was a shift

7    leader.  As Mr. McDonald tells me, Angel was right on

8    track to become his manager.  He was trusted with great

9    responsibilities.  He was given a key to the restaurant.

10   And Mr. McDonald notes he was valued and a hard-working

11   employee.  Angel really looks up to Mr. McDonald and he

12   plans to continue working at Luna Pizza.  He's very

13   grateful and thankful that Mr. McDonald has accepted his

14   apology and is willing to move forward.  He knows that he

15   let him down.  Mr. McDonald knows that Angel made some

16   really big mistakes and some really bad choices, but he

17   knows he's determined to learn from this experience and

18   move forward.

19           And as the Court knows, Angel has already

20   enrolled in the adult education program.  He's working

21   towards getting his GED.  He's already taken the

22   pre-classes and the pre-tests.  There's the four GED

23   tests.  He decided to take science and social studies

24   tests first because those were his most difficult tests.

25   He did not pass the social studies, he missed it by just 5

1 points, but he passed the science exam.  And this hasn't

2 been easy for him.  School has never been easy for him.

3 He regrets now that the choices he made as a high school

4 student were not towards the value of his education.  He

5 really regrets that now, but he knows that if he can get

6 his GED, he can continue to move forward and go to

7 technical school and get a technical degree.  He knows

8 that once he passes the social studies exam, he's got the

9 math and the reading portion of the GED, but he's very

10 confident in his ability to pass those.  He indicated to

11 me that he thought he would take the hardest ones first to

12 get over the hardest loop and then it would be smooth

13 sailing on the GED.

14        As Your Honor saw from the progress reports, his

15 evaluation indicates that his attendance, his initiative,

16 his productivity and his attitude are all excellent.  And

17 his evaluator believes that he has made great progress and

18 is on track to get his GED in this upcoming school year.

19        When he gets out, Angel wants to continue

20 school.  But above all, he wants to be the family man that

21 he was, but he doesn't want to have the other side of him

22 that was truthfully there as well.  As Angel noted in his

23 letter, he was living two lives.  He was working

24 full-time, he was being there for his family, but then he

25 was out there like the facts of this case show.  And

1   that's the person that he doesn't want to go back to and

2   he knows he can't go back to.

3           And for those reasons and all of these reasons,

4   we would ask for a sentence on the low end of the

5   guidelines range.  A sentence of 46 months would

6   sufficiently punish Mr. Cabrera, but it would also allow

7   him to return home to his family.  It would allow him to

8   prove to Your Honor, to his family, to his boss, and to

9   his community that he can be that hard-working person,

10  that he can be that individual that they can look up to,

11  and that he can make his daughter proud.

12          Finally, Your Honor, we would just ask that you

13  would recommend sentence either in Danbury or Otisville,

14  depending on the designation that the Bureau of Prison

15  gives him so he could be as close to his family as

16  possible.

17          THE COURT:  Understood.  Thank you, Ms. Moreau.

18          MS. MOREAU:  Thank you, Your Honor.

19          THE COURT:  Does Mr. Cabrera or any members of

20  the family wish to say anything?

21          Come on up to the lectern, Mr. Cabrera.

22          THE DEFENDANT:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          THE DEFENDANT:  I wrote a letter.  I just want

25  to say that I'm sorry to the Court and that I'm not proud

1   to be here and very ashamed of what I did.

2          I'm sorry to the people that I hurt and I know

3   more people could have gotten hurt, and I'm not proud of

4   my choices.

5          I'm sorry to my family, especially my mom.  I

6   wasn't there to help her in her recovery, and I know this

7   has been hard on her.

8          I'm sorry to Samiras and my daughter Lelanii.  I

9   wasn't at the hospital when she was born and I haven't

10  been in her life how I want to be.  I didn't have a father

11  in my life and I want to be there for my daughter.

12         I'm working on getting my GED.  I have taken the

13  classes and pre-tests.  I've so far passed the science

14  exam.  It hasn't been easy, but I'm trying so I can move

15  forward and be a better man.

16         When I get out, I'm going right back to work.

17  I'm thankful for my boss, Alex, is willing to give me a

18  chance and go back to work.

19         I want to work full-time and also go back to

20  school at Porter and Chester.  Porter and Chester offers a

21  program for auto mechanic training.  I used to help my

22  uncle work on cars and fix them.  And I just want to help

23  support my family.

24         Thank you for reading my letter and giving me

25  this time.  I have a lot of work ahead, but I'm ready to

1   make my family and daughter proud.

2           Thank you, Your Honor.

3           THE COURT:  Certainly.

4           So it's good to hear that you're thinking about

5   what you want to do and, you know, the accomplishments

6   that you've had so far.  Clearly you've had some.

7           Help me understand why -- what is it that you

8   seem to enjoy about beating up people?

9           THE DEFENDANT:  I never enjoyed it.  Most of my

10  time, I was under the influence of alcohol and drugs.  I

11  was in a rough spot in my life, which I was confused.  And

12  I'm not proud of what I did.  I'm ashamed.  That's not the

13  way my mom raised me.  And that's not the way I want to be

14  or that's not the way I want my daughter to see or have a

15  father like that.

16          THE COURT:  Anything else you want me to know?

17          THE DEFENDANT:  No, Your Honor.  Thank you for

18  hearing me.

19          THE COURT:  Certainly.  Thank you very much.

20          THE DEFENDANT:  Thank you, Your Honor.

21          THE COURT:  Ms. Moreau, anything else?

22          MS. MOREAU:  That's it from us, Your Honor.

23  Thank you.

24          THE COURT:  Mr. Leaming.

25          MR. LEAMING:  Thank you, Your Honor.

1          I wanted to follow up on some of the Court's
2    questions.  And as I heard Counsel's discussion as well as
3    Mr. Cabrera's statements, I was sort of jotting some notes
4    of chronology of what happened in this case and some of
5    the other important facts and dates.
6          If you go back to April 2017, we know that at
7    that time Mr. Cabrera was apparently successfully
8    employed, had a family that was supportive of him.  He had
9    been recently placed on probation from a narcotics charge
10   and I think a burglary charge, but those occurred around
11   December of 2016.  So he was on probation on April 28,
12   2017, and was associating with members of the Latin Kings.
13         And Mr. Cabrera was the younger of the group.
14   Most of the other members were well-established
15   Latin Kings.  Mr. Velez was state regional officer at the
16   time and was a high-ranking member within the state and
17   certainly within the city of Hartford.  And Mr. Cabrera,
18   you know, injected himself into this group.
19         And go back to April 28 and the video clearly
20   shows the events that preceded what happened.  Mr. Velez
21   was clearly in control of the situation, but once they had
22   either confirmed or disarmed the first victim, Mr. Cabrera
23   and his four other Latin King associates had him
24   surrounded.  And it was Mr. Cabrera without provocation
25   that struck the victim in the head and attempted to strike

1   him again as the victim tried to escape.

2           And Mr. Cabrera was successful in getting away.

3   He was lucky not to have been shot himself.  He ran to a

4   position of cover behind a parked vehicle where Mr. Amaral

5   had also run.  Mr. Amaral had been shot in the leg and was

6   shown in the video stumbling along carrying a gun, lucky

7   not to get shot again.  Mr. Cabrera in what turns out to

8   be a series of bad decisions decides to take the gun from

9   Mr. Amaral.  He runs behind some houses adjacent to him

10  and Mr. Amaral are hiding and disposes of the firearm.

11          Mr. Cabrera wasn't arrested that day.  Only

12  Mr. Amaral and Mr. Claudio were arrested.  Mr. Claudio had

13  suffered pretty serious gunshot wounds.  Mr. Amaral's

14  injury was also serious but not life-threatening.

15          The investigation from the Hartford perspective

16  sort of stalled after that.  Mr. Claudio actually went

17  into a coma and was basically unable to be interviewed for

18  several months actually before he made a remarkable

19  recovery.  Meanwhile, the FBI became involved to assist in

20  the investigation, principally because they were

21  interested in Mr. Velez's Latin King activities.

22          Shortly after the events of April 28, there was

23  never a warrant issued for Mr. Cabrera, the Hartford

24  police never sought him out for the events of April 28.

25  And as I understood, and maybe I didn't get the dates

1   right, but he sort of abruptly left work in July.  Didn't

2   seem to make a whole lot of sense for that.  But it struck

3   me that his decision to leave work was because he wanted

4   to live this lifestyle.

5           And in August, on August 15 of 2017, he was

6   arrested by Hartford police for selling drugs.  He was

7   released on bond.  Meanwhile, the FBI had been continuing

8   its investigation and tasked a confidential source to

9   purchase what they believed to be a gun and some drugs

10  from Mr. Cabrera.  That happened on September 6, 2017.

11  Mr. Cabrera actually sold a fake gun to the source and a

12  small quantity of suspected heroin and fentanyl.

13          Meanwhile, the government's investigation while

14  principally focused on Mr. Velez continued sort of moved

15  away from Mr. Cabrera.  There was a lengthy period of

16  wiretaps targeting Mr. Velez.  But in the meantime,

17  Mr. Cabrera made bond after his August arrest, was

18  involved in a violent assault of a homeless woman in

19  December of 2017.  That ultimately resulted in his arrest

20  in January of 2018 for which he's been perpetually

21  incarcerated since then.

22          Those are not one bad decision or getting caught

23  up in sort of one bad plan or plot.  Those are a series of

24  calculated and intentional decisions.

25          One thing that struck me in reviewing the video

1    of the assault robbery which is still pending is this

2    homeless woman lying on the ground defenseless and

3    Mr. Cabrera kicking her in the head and the body.  And I

4    don't know, I think it's --

5              THE COURT:  Does she have any kids, the homeless

6    woman?

7              MR. LEAMING:  I'm sorry?

8              THE COURT:  Does the homeless woman have a

9    child?

10             MR. LEAMING:  I'm not sure, Your Honor, of her

11   personal background.

12             You know, the event was sort of a free-for-all.

13   There were multiple people assaulting this woman.

14             THE COURT:  All for a phone, right?  Basically

15   an iPhone?

16             MR. LEAMING:  It looked like they were trying to

17   steal something from her.  It looked like there was --

18   there's no audio in the video.  There's some exchange with

19   one of the females that Mr. Cabrera was with.  The woman

20   is basically sitting outside the store.  And then the

21   other -- the female with Mr. Cabrera attacks her.  And

22   then they have her on the ground.  And when you see

23   Mr. Cabrera come in, it's almost like he sort of doesn't

24   really care what's going on, he just jumps in on the

25   action and starts to kick her.  I can't imagine a

1   circumstance at which any level of intoxication would say

2   that would excuse my behavior.  To me, you can't just sort

3   of blame drug abuse on that or drug use.  There's

4   something else that goes on.  I thought what was telling

5   is when he described coming back into the Hartford school

6   system was because he liked the fighting.  And now he's

7   associating with a street gang that is known for violence.

8   It struck me that's part of what Mr. Cabrera is.  And I

9   think that the reason why the Court should impose the

10  sentence at the high end is because if that's his mindset,

11  then there's a real genuine need to protect the community.

12  There's a real genuine need to deter Mr. Cabrera, because

13  clearly pending cases and pending violations of probation

14  and being on pretrial release didn't deter him.

15          And that when you consider all of those things

16  and even accepting some of the mitigating factors of like

17  many offenders who appear here with a history of drug use

18  and drug abuse, and while that sometimes goes some way to

19  explain why you sell drugs to support your habit and sort

20  of engage in that conduct, I don't think it could ever be

21  used as an excuse for unmitigated violence, unjustified

22  violence.  Frankly, that's really I think when you look at

23  a community what scares people the most.  When you look at

24  that video, it's 11:00 in the morning on a busy street.

25  To think that that could happen and does happen is

1  concerning to everybody in that community.  When people

2  are exchanging gunfire while cars are driving by and

3  people are walking down the street, and that's the

4  associations that Mr. Cabrera is making and that's the

5  conduct which he helped precipitate, then there's a real

6  need here for a lengthy period of imprisonment for

7  Mr. Cabrera.  He needs a substantial period of time to

8  think about that.  And most importantly, the community

9  needs a substantial period of time to feel protected and

10  hope that when Mr. Cabrera comes out he'll do the things

11  that he says he's going to do.  But I don't think we're at

12  the point where we can accept his word.  I think his

13  conduct is pretty compelling as to why a sentence of 57

14  months is minimally necessary.

15          Thank you, Your Honor.

16          THE COURT:  So in terms of his association with

17  the Latin Kings, obviously the one incident April of 2017,

18  that's a Latin Kings kind of thing.  But what can you tell

19  me, what do we know about how kind of entranced or

20  intrigued with the whole Latin king organization is

21  Mr. Cabrera?  For instance, the later drug transaction

22  that occurs, is that again part of him kind of trying to

23  work his way up, he's the newbie, he's going to become an

24  important person in the Latin King organization, as far as

25  you know?

1           MR. LEAMING:  He certainly continued with his

2    associations after the April 2017 events.  And the FBI was

3    focusing on those known members and associates of the

4    Latin Kings.  The Latin Kings of 2017 aren't what they

5    were in, say, 1994.  And while most of the Latin Kings

6    that we targeted in this case all sort of subscribe to

7    their manifesto which sets forth certain conduct and

8    acceptable conduct that they're obliged to follow, they

9    often operated independently on a lot of their drug

10   activity.  There isn't a traditional pyramid in the drug

11   flow, although in this case Mr. Velez did supply a number

12   of other Latin Kings in different areas of the city.  And

13   so he was not only a leader organizationally, but he was

14   also a source of supply for a lot of the drug offenders

15   that were charged in this case.  But there's also a

16   component of being sort of an independent operator.

17   Everybody is sort of looking to make money.

18           So the structure that we see in 2017 wasn't as

19   rigid as we've seen in mid- and late-'90s.  But it was

20   sort of perpetual associations of -- and this was sort of

21   a classic example of, you know, Velez recruiting his

22   people to say "we got a problem, we got a guy who's

23   selling drugs on our block, he isn't getting drugs from us

24   and he's not a Latin king, and we need to take care of

25   that."  It sort of embodies the belief that in certain

1    neighborhoods in the city of Hartford and other urban

2    areas the street gangs control the criminal activity

3    because it all flows from the drugs.  While you may

4    obviously have some sort of random act of violence between

5    parties that have no gang affiliation, everyone knows you

6    can't walk out on the street corner and sell drugs in

7    certain blocks and certain neighborhoods.  Mr. Cabrera was

8    a Latin king so he could do that.  The fact that we could

9    buy drugs from him and the gun is supportive of his

10   stature in the organization.

11            THE COURT:  The gun he ended up selling was a

12   fake gun?

13            MR. LEAMING:  It was fake.  I can't remember if

14   it had no fire pin or -- it was inoperable and could not

15   readily be convertible -- it looks like a gun.  In fact, I

16   recall when it happened, you know, the agents called me,

17   "hey, we just bought a gun from Angel Cabrera."  Then upon

18   closer inspection when it got down to the FBI office, no,

19   this isn't a gun.  I mean, it looks like a gun.  If you

20   pulled it out on the street and pointed it at somebody,

21   they would think you're pointing a gun at them.

22            THE COURT:  It was kind of a Mickey Mouse effort

23   to sell a gun, I take it?

24            MR. LEAMING:  You know, it's not the first time

25   that this has happened or we bought drugs and they turned

1   out not to be drugs.  It's potentially high-risk behavior.

2   You're dealing with a source, maybe you think you know the

3   person, maybe not, but you got to know that that person is

4   going to figure out that it's not a gun and they're going

5   to be coming back looking for their money.  So it's sort

6   of high-risk behavior in that regard.  You know, it could

7   be considered sort of reckless "I see easy money and I

8   think I can get away with it."

9           One thing I've seen, more recently had another

10  wire case where we kept buying.  The guy initially sold us

11  fentanyl was now just selling us caffeine.  And we're

12  thinking, it's going to catch up to you.  And drug dealers

13  don't forget.  He was lucky that it was a FBI source that

14  wasn't going to do anything to him.  He sold that fake gun

15  to somebody else, probably could find himself in the

16  crosshairs of more violence.  You know, it could cut both

17  ways.

18          THE COURT:  I see.  I see.

19          So when you look at this other robbery and

20  assault charges, obviously is still pending, though it

21  looks like, sounds like there's a pretty compelling video

22  showing his involvement, what's your sense?  I've heard

23  from Ms. Moreau, but what's your sense of how the Court

24  should factor in the fact that he's been in prison for

25  some 13 months on what looks like on a straight charge

1    that's probably -- well, you deal with the state

2    authorities a lot.  It sounds like pretty readily

3    provable, not the kind of thing that just gets nolle'd.

4    And if it doesn't just go away like that, it sounds like

5    the 13 months that he's been in would not be credited in

6    any way towards the federal sentence; does that sound

7    about right?

8              MR. LEAMING:  So if he goes to court next week

9    or some date in the future and he receives a period of

10   imprisonment for the assault, robbery, however that case

11   is resolved, and that period of imprisonment exceeds -- or

12   I guess it doesn't have to exceed, but if he receives any

13   period of imprisonment, because he's in state custody, it

14   would be my understanding that he will get credit from

15   that January 2018 date he went into state custody and it

16   will be applied to that state sentence.  When BOP does its

17   assessment, it won't give him credit for time that is

18   attributed to another sentence is my understanding how

19   that will operate.

20             He's been in, quote/unquote, federal custody

21   since May of 2018 when he was brought.  So...

22             THE COURT:  I'm sorry, maybe I misunderstood.  I

23   thought he was in state custody even until today.

24             MR. LEAMING:  He is in state custody, yes, but

25   ordered detained on the federal case as well.

1        THE COURT:  Since May.

2        MR. LEAMING:  Since May.

3        Again, it depends on what the actual sentence is

4   that's imposed in state court.  It may be that the entire

5   time from January until today or until he gets

6   sentenced -- whatever sentence the Court is imposing,

7   he'll get time from today on his federal sentence.

8        THE COURT:  I understand that.  But then the

9   question is:  Does he get time from, say, last May?

10        MR. LEAMING:  It's hard to say.  I've had a

11   conversation with the state prosecutor as to what their

12   intentions are.  And they don't have -- this is

13   probably -- I know I spoke to him when we were getting

14   ready for the initial sentencing, I think it was in

15   January.  So it was a couple months ago.  And they didn't

16   have an agreement in place.  He was curious as to what was

17   going to happen here.  And I have no offer to the Court as

18   to what would happen.

19        THE COURT:  Okay.  Thank you very much.

20        Ms. Moreau, maybe just consult with Mr. Cabrera,

21   make sure there's nothing else he wants you to respond to.

22            (Pause.)

23        MS. MOREAU:  No, Your Honor.

24        THE COURT:  Do you have anything else?

25        MS. MOREAU:  I don't, Your Honor.  Thank you.

1            THE COURT:  All right.  So I'm going to turn to

2    the imposition of sentence at this time.

3            Mr. Cabrera, I'm required under the law to

4    consider a large number of factors when deciding what's

5    appropriate in terms of a sentence.  Of course I have to

6    think about what it is you did wrong that brings you into

7    court, what you've done wrong unfortunately on other

8    occasions.  I also have to look at everything else about

9    you in terms of your life and the challenges you've had

10   and the successes that you've had that we've heard about

11   very well stated by your counsel, Ms. Moreau.

12            I have to think about what are the purposes of a

13   criminal sentence.  And of course those include what's a

14   just punishment for getting involved in the kind of

15   violent activity, some drug activity that you did.  I have

16   to think about what will promote respect for the law and

17   reflects the seriousness of the offense.  I have to be

18   thinking about deterring or discouraging you from ever

19   getting back and doing this again and discouraging others,

20   as well as rehabilitation, basically a fancy way of saying

21   putting you back on the right track to fundamentally

22   change and be the person that you tell me you want to be

23   and your mom expects you to be and girlfriend and family

24   expects you to be.

25            I have to consider the Sentencing Guidelines

1  and, of course, I do give them serious consideration; the

2  need to avoid giving you a sentence that's markedly

3  different than the sentence that somebody else would

4  receive essentially in the same boat in another courtroom

5  like this.

6         Basically, I have to think about everything I

7  know about you and learned about you, both the "good" and

8  the "not so good," and decide upon a sentence that's fair

9  and just and reasonable and also one that's not greater

10  than necessary to serve the purposes of sentencing I've

11  just talked about.

12         So for you, you've heard my concern.  I don't

13  think I can say it more plainly.  I am concerned that you

14  have a violent streak, that somewhere, whether it's under

15  drugs or alcohol or something, that you seem to derive

16  some sort of self-worth or something there from hitting

17  people.  That's a big concern for me.  That's a basic

18  issue of community safety.

19         You don't come into court, and I understand you

20  haven't served previous prison terms before, I can't help

21  but thinking partly because you were able to come into

22  court and say look at everything else I've been doing

23  right in my life, working at Luna, et cetera.  And you got

24  sentences in those cases that did not involve

25  incarceration.  I know you understand now times have

1    changed.  But I'm concerned as well about the amount of

2    time that you were involved with going back in time, your

3    other convictions.

4         I pretty much accept and believe Mr. Leaming's

5    account of what happened with you leaving Luna.  I don't

6    really buy the idea that you just were going to avoid --

7    you were concerned about Alex at that point in time.  I

8    think that you did make a choice, enough with this, I'm

9    going to go into hanging around with these guys who are

10   selling drugs and just doing stuff where I'm basically not

11   accountable.  I think that that best explains or most

12   plausibly explains why you left the employment at Luna

13   when you did.  And explains why you didn't tell Alex and

14   only later.

15        So that's the concern.  It seems to me you went

16   through certainly a streak in 2017, 2018, end of 2017

17   where you were just on the streets and going to play that

18   side.

19        On the other side of the coin, there's a lot to

20   say that's pretty positive.  You do have a record before

21   then of getting a job, holding a job, and impressing the

22   people you worked with.  Your support from Alex means a

23   lot to me in terms of the endorsement he gives to you, his

24   willingness to work with you again and have you work with

25   him, keeping in mind that you have even broader ambitions

1    to work with Porter and Chester and even get advanced

2    mechanical training.  I'm also impressed by your own

3    educational efforts that you're undertaking I think in

4    good faith.  You're not beating up people in prison, I'm

5    glad to see.  You're probably handling conflict issues

6    well, better than some that go in.  You have good family

7    support.  You have a really admirable mom that's faced

8    some remarkable health challenges.  She's an impressive

9    person by all accounts.  You didn't have a father, but she

10   didn't have that support from him either.  She's luckily

11   had Mr. Carrasquillo to support her.

12          You have a new responsibility in your life.

13   It's good to see Samiras has come in to support you today,

14   but you're going to have years of being there for that

15   child.  It's going to be a while before you're with that

16   child, but that child is going to be counting on you to be

17   involved, stay involved.  There will be some really

18   challenging times for you.  Raising a child under any

19   circumstances is difficult, but you face some significant

20   challenges.  It sounds to me you're thinking about those,

21   and that's to your credit.

22          So all in all, as I kind of balance and look at

23   both sides here, I'm persuaded on balance ultimately by

24   your counsel's recommendation here in terms of what's an

25   appropriate sentence.  I fully understand Mr. Leaming

1   coming in here and saying it should be higher than the

2   minimum of the Sentencing Guidelines, but I want to give

3   you a little bit of the benefit of the doubt in terms of

4   the support you have and in terms of what you've written

5   and told me today.  I want to give you some of that

6   benefit of the doubt.

7           I'm also a little bit unclear about just what's

8   going to happen with the state case.  So I don't, in terms

9   of imposing a sentence, want to impose undue reliance on

10  what may happen with that state case.  And I do think that

11  a term even at the bottom of the Sentencing Guidelines

12  range is a substantial term of imprisonment for anybody to

13  face.  And I'm just not convinced that adding more to the

14  very top of the Sentencing Guidelines range would really

15  make the difference in terms of what choices you decide to

16  make.  Ultimately, it's going to be up to you.

17          You're going to have a probation officer and the

18  Probation Office is going to be checking in on you.  It's

19  a very different kind of process, I'm sure Mr. Sheehan and

20  Ms. Moreau would tell you, having a federal probation

21  officer and the kind of support that you get than you

22  probably were used to at the state system.  But ultimately

23  it's going to be up to you.  You're going to basically

24  make these fundamental choices.  Do you go back to the

25  easy life, easy money, some sort of false respect that you

1    get from your, quote, friends, to go back to that or do

2    you actually be actually a real man and support a family

3    and do what your father didn't do for you?  So you're

4    going to make that choice.  It's going to be a choice,

5    especially after you finish your term of incarceration,

6    that you'll have to very consciously make not to try to

7    impress a judge or the prosecutor or defense counsel.  And

8    my hope is you'll make that right choice, and a year after

9    you're done with your prison sentence I'll hear from

10   Ms. Moreau or Mr. Sheehan, wow, Mr. Cabrera really is

11   doing well.  I hope that's what I hear.  Or you'll write a

12   letter to the Court saying, hey, by the way, I'm doing

13   really well.  You can do that.  That's my hope anyways.

14           So all in all, I'm going to impose a sentence

15   basically as recommended by your counsel here.  I'm going

16   to ask you to stand at this time, sir, for the imposition

17   of sentence.

18           Mr. Angel Cabrera, I'm sentencing you to a term

19   of 46 months of imprisonment.  And I will impose a

20   three-year term of supervised release.  A criminal fine,

21   I'm not going to impose a criminal fine.  You need to be

22   out there working and actually making money and supporting

23   your family.  And I'll impose the required $100 special

24   assessment.

25           For conditions of supervised release, I impose

1    the standard conditions under 5D1.3(c) of the Sentencing

2    Guidelines.

3              I impose the mandatory conditions.  Those

4    mandatory conditions, of course, that you can't commit

5    another federal, state, or local offense.  Number two, you

6    can't unlawfully possess a controlled substance.  That

7    means marijuana.  Any kind of controlled substances I know

8    that you've had some experience with.  If it's true, as

9    you told me, that you did what you did when you were under

10   the influence there, you must understand the need to get

11   your pleasure from something other than drugs in the body.

12   I'll also require you to refrain from any unlawful use of

13   a controlled substance and submit to periodic drug tests

14   within 15 days of release on supervised release and at

15   least two periodic drug tests thereafter, probably much

16   more.  The Probation Office is pretty good at that.  And

17   I'll tell you what happens is -- and your counsel would

18   tell you this as well -- if you fail those drug tests, I

19   get a report of that.  And it probably means you're back

20   into court and we're having another hearing to see what's

21   going on.  And I'll be very concerned at that point, you

22   should know.  Very, very concerned.  If you're using

23   again, you know, based on what you just told me, that this

24   is the trigger or this is something that facilitates you

25   beating up people even if they're homeless people, that

1   will tell me it's time to protect the community, it's time

2   for you to go back in.  So you should know that that's

3   going to be a very important condition for you to observe

4   when you're on supervised release.

5           I'll also impose the very specific special

6   conditions in Paragraph 99 of the Presentence Report that

7   I know have been reviewed.  And they're also very, very

8   important.  Among those, of course, is not to associate,

9   communicate, or otherwise interact with any known member

10  of the Latin Kings.  And you know what we mean by that.

11  And if you have unclarity, if you feel like, gosh, there's

12  something unclear about whether a particular person is

13  this member or will be within this prohibited group,

14  that's something you talk to your counsel about, talk to

15  the Probation Office about.  And if there's some reason

16  that the person works with you or something like that, you

17  can always ask for an exception, permission.  But the

18  burden is on you to make sure that you're abiding by that

19  condition.  Do you understand that, sir?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Now, you're also going to be part of

22  an inpatient or outpatient substance abuse treatment

23  program.  And that's also very important, I'm sure you

24  understand, in addition to those other conditions,

25  Paragraph 99 of the Presentence Report.

1          So I'll ask all counsel, that's the sentence the

2   Court is imposing, any reason I can't lawfully impose that

3   sentence I just imposed?

4          MR. LEAMING:  No, Your Honor.

5          MS. MOREAU:  No, Your Honor.

6          THE COURT:  Judgment of the Court will be

7   prepared for my approval by the Clerk's Office.

8          Ms. Gutierrez is reminding me that I think I

9   forgot the mandatory condition that you would be subject

10  to a test for DNA, so I'll impose that as well, mandatory

11  condition.

12         And I'll make a recommendation, as you've asked,

13  for designation either to Danbury or to Otisville which

14  would be nearest as possible.

15         Any other recommendations?

16         MS. MOREAU:  No, Your Honor.

17         THE COURT:  And then in terms of your appeal

18  rights, Mr. Cabrera, you do have the right to appeal under

19  certain circumstances.  They may be limited by your own

20  plea agreement.  You have the right to appeal either the

21  conviction or the sentence imposed.  If you wanted to do

22  that, you need to do so within the next 14 days; otherwise

23  you'll lose your right altogether to have an appeal.  And

24  if you could not afford counsel, you would have counsel

25  appointed to pursue your appeal.  Do you understand that,

1  sir?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Anything else?  Are there counts to

4  dismiss?

5          MR. LEAMING:  Yes, Your Honor.  As to this

6  defendant only, we ask that Counts One and Four be

7  dismissed, Your Honor.

8          THE COURT:  We'll dismiss those counts as to

9  Mr. Cabrera only.

10          Anything else?

11          MR. SHEEHAN:  No, Your Honor.  Thank you.

12          THE COURT:  Thank you all.  Stand in recess.

13              (Proceedings adjourned at 11:07 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4        RE: UNITED STATES OF AMERICA v. ANGEL CABRERA

5                       No. 3:18CR90(JAM)

6

7            I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 44 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                      _____/s/_____

18                      DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
19                      United States District Court
                          141 Church Street, Room 147
20                      New Haven, Connecticut 06510
                              (860) 463-3180
21

22

23

24

25